**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>JULIEN GIRAUD JR., and<br>JULIEN GIRAUD III,<br><br>                 Defendants. | CASE NO. 24-CR-768 |

---

**DEFENDANT JULIEN GIRAUD JR.'S SUPPLEMENTAL BRIEF
CHALLENGING LEGALITY OF APPOINTMENT OF PUTATIVE ACTING U.S.
ATTORNEY ALINA HABBA AND SEEKING INJUNCTIVE RELIEF**

---

Thomas S. Mirigliano, Esq.
**LAW OFFICE OF**
**THOMAS S. MIRIGLIANO, ESQ., P.C.**
40 Wall Street, 32nd Floor
New York, New York 10005
(718) 530-6548
TSM@MiriglianoLaw.com
*Attorneys for Defendant Julien Giraud Jr.*

## PRELIMINARY STATEMENT

Defendant, Julien Giraud Jr., ("Giraud Jr."), by and through his undersigned counsel, respectfully submits this supplemental brief in further support of his motion challenging the legality of Alina Habba's ("Ms. Habba") appointment as putative Acting United States Attorney for the District of New Jersey, and seeking appropriate injunctive relief barring her and any Assistant United States Attorneys operating under her direct supervision from participating in the prosecution of this case.

The Executive's actions – specifically, Attorney General Pam Bondi's ("AG Bondi") removal of a lawfully court-appointed interim U.S. Attorney Desiree Leigh Grace ("Ms. Grace") and the effort to reinstall Ms. Habba – represent a legally indefensible scheme designed to circumvent clear constitutional and statutory constraints. These irregular procedural tactics violate both the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. §§ 3345 et seq., and 28 U.S.C. § 546(d), as well as fundamental principles of due process, separation of powers and the Appointments Clause, rendering Ms. Habba's prosecutorial authority *ultra vires* and unconstitutional. These unprecedented measures were plainly engineered to install an individual whom the Senate had not, and likely would not, confirm, in direct derogation of Congress's constitutionally mandated role in the appointments process.

Given the United States Attorney's critical role in administering and overseeing all criminal and civil matters involving the United States in this District, the legality of Ms. Habba's appointment is not an abstract or technical issue. It has direct, ongoing implications for the integrity of every prosecution in the District of New Jersey, including this one. The potential consequences cast uncertainty over the entire system, undermine public confidence in the administration of justice and demand prompt, decisive judicial intervention

## FACTUAL AND PROCEDURAL BACKGROUND

As to the relevant factual and procedural background, Giraud Jr. relies upon and incorporates by reference the comprehensive recitation set forth in this Court's Memorandum Opinion dated August 1, 2025 (Doc. 116). For clarity and judicial economy, Giraud Jr. adopts the Court's detailed summary of events concerning the appointment, resignation and subsequent re-appointment of Ms. Habba as Acting United States Attorney for the District of New Jersey, along with the corresponding removal of Desiree Leigh Grace ("Ms. Grace"), as detailed therein.

Specific facts relevant to the legal arguments presented herein are briefly summarized for the Court's convenience. Furthermore, Giraud Jr. relies upon the current record and incorporates by reference all arguments previously submitted by defense counsel.

## LEGAL ARGUMENT

### I. MS. HABBA'S RE-APPOINTMENT CONTRAVENES BOTH CONSTITUTIONAL AND STATUTORY LIMITATIONS

Under the Appointments Clause, the President appoints "Officers of the United States" with the "Advice and Consent of the Senate." U.S. Const. art. II, § 2, cl. 2. An "Officer of the United States," as distinct from a non-officer employee, is any appointee who exercises "significant authority pursuant to the laws of the United States," *Buckley v. Valeo*, 424 U.S. 1, 126 (1976), and who occupies a "'continuing' position established by law," *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (quoting *United States v. Germaine*, 99 U.S. 508, 511-12 (1878)); *Edmond v. United States*, 520 U.S. 651, 662 (1997) ("The exercise of 'significant authority pursuant to the laws of the United States; marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather, as we said in *Buckley*, the line between officer and non-officer.") (internal citation omitted). Presidential nomination and Senatorial confirmation are the "default manner of appointment" for principal and inferior officers. *United States v. Arthrex, Inc.*,

3

594 U.S. 1, 12 (2021). But the Appointments Clause provides another means to facilitate inferior-officer appointments, and it does so through the so-called "Excepting Clause." *Edmond*, 520 U.S. at 660. That clause permits Congress – and Congress alone – the power "by law" and as it "thinks proper" to "vest" the appointment of such inferior officers in three places: "in the president alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

The Framers deliberately divided the appointment power between the executive and legislative branches to guard against presidential favoritism, "prevent the appointment of unfit characters," and ensure administrative stability. *See Associated Builders & Contrs. Of Se. Tex., Inc. v. Julie Su*, 771 F.Supp.3d 879, 908 (E.D. Tex. 2025) (citing The Federalist No. 76, at 457 (Alexander Hamilton) (C. Rossiter ed., 1961)); *Weiss v. United States*, 510 U.S. 163, 187 (1994) (Souter, J., concurring) ("any decision to dispense with Presidential Appointment and Senate Confirmation is Congress's to make, not the President's."). As previously discussed, the Appointments Clause is a structural safeguard designed to maintain the separation of powers and ensure accountability in the appointment process. (Doc 113, pp. 2-3).

To address the practical challenges posed by vacancies, Congress has since the founding of the Republic enacted vacancy statutes that authorize the President to appoint acting officials to temporarily perform the functions of vacant offices, thereby ensuring continuity and maintaining the functioning of the federal government. *See NLRB v. SW General, Inc.,* 580 U.S. 288, 294 (2017). These statutes aim to avoid a significant consequence of the appointments framework; namely, that without a confirmed appointee, the responsibilities of an office may go unperformed when the President and Senate cannot promptly agree on a replacement. *Id*. at 292. There are two statutes at issue here governing temporary service for U.S. Attorneys: the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345 *et seq*., and 28 U.S.C. § 546(d).

Typically, U.S. Attorneys are presidential appointees subject to Senate confirmation. *See* 28 U.S.C. § 541. In this case, Ms. Habba's continued role as Acting U.S. Attorney is challenged as *ultra vires* because it flagrantly violates both the FVRA and the specific statutory authority granted to federal district court judges under 28 U.S.C. § 546 to appoint interim U.S. Attorneys. Through a series of shifting designations, resignations and temporary appointments, the Executive has effectively enabled Ms. Habba to indefinitely act as the U.S. Attorney for the District of New Jersey without Senate confirmation. These actions circumvent clear statutory constraints, undermine congressional intent, and directly contravene the Appointments Clause and the comprehensive statutory framework enacted to uphold it.

### a. HABBA'S RE-APPOINTMENT VIOLATES THE FEDERAL VACANCIES REFORM ACT AND 28 U.S.C. § 546

#### i. APPLICABLE LAW

The FVRA was enacted in 1998 as a replacement for the earlier Vacancies Act. *See* Pub. L. 105-277, § 151, 112 Stat. 2681 (1998); *NLRB v. SW General, Inc.,* 580 U.S. 288, 295 (2017). The Supreme Court has explained that the FVRA was Congress's response to a perceived "threat to the Senate's advice and consent power." *SW General,* 580 U.S. at 295. Thus, the FVRA reflects Congress's careful balancing of the need for continuity in government operations with the constitutional imperative of maintaining checks on executive power. *Id.; see SW General,* 580 U.S. at 295; *Bullock v. United States BLM*, 489 F.Supp.3d 1112, 1125 (D. Mont. Sept. 25, 2020).

The FVRA establishes the default framework for temporarily filling vacancies in positions requiring Presidential appointment and Senate confirmation ("PAS positions"). *See* 5 U.S.C. §§ 3345 *et seq.*; *L.M.-M. v. Cuccinelli*, 442 F.Supp.3d 1, 24 (D.D.C. 2020). It serves as the *exclusive* statutory mechanism by which acting officials may temporarily assume duties and functions of PAS offices, except where another statutory provision expressly provides an alternative method.

*See* 5 U.S.C. § 3347(a).  Courts have noted that "[t]he FVRA both safeguards the Senate's confirmation powers and prevents the president from running amok with temporary appointments." *Julie Su,* 771 F.Supp.3d at 908 (citing *SW General,* 580 U.S. at 295).  Accordingly, acting officials appointed under the FVRA may serve only temporarily and are strictly constrained by explicit statutory time limitations. *See SW General.,* 580 U.S. at 296; *Aviel v. Gor*, 2025 U.S. Dist. LEXIS 65269, *26 (D.D.C. April 4, 2025) (emphasizing that the FVRA imposes time limitations on acting officials to prevent indefinite appointments, which would undermine the Appointments Clause); *Gorecki v. Comm'r, SSA,* 2025 U.S. App. LEXIS 17336, *6 (reaffirming the FVRA's strict time constraints); *Asylumworks v. Mayorkas*, 590 F.Supp.3d 11 (D.D.C. Feb. 7, 2022) (reiterating that the FVRA dictates who may serve in an acting capacity and imposes a 210-day time limit, ensuring compliance with constitutional requirements); *Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, 605 F.Supp.3d 28, 45-46 (D.D.C. May 24, 2022) (emphasizing that FVRA provides the exclusive means for temporary appointments and imposes strict time limits); *see also* 5 U.S.C. § 3345(a)(2) (an acting officer under § 3345 serves "temporarily in an acting capacity subject to the time limitations of section 3346").  These statutory time limits are integral to ensuring that acting appointments remain temporary, preventing executive attempts at indefinite appointments that could undermine the Appointments Clause. *See* 5 U.S.C. §§ 3345(a)(2), 3346.

The FVRA explicitly bars certain individuals from serving in an acting capacity, including those whose nominations have been formally submitted to the Senate for the same position. *SW General,* 580 U.S. at 295; *see* 28 U.S.C. § 3345(b)(1).  It also contains enforcement mechanisms to ensure compliance, explicitly providing that actions taken by individuals who are improperly serving under the FVRA are deemed to have "no force or effect" and cannot subsequently be ratified. 5 U.S.C. § 3348(d); *see SW General,* 580 U.S. at 296; *Julie Su*, 771 F.Supp.3d at 908.

Specifically addressing vacancies in U.S Attorney positions, 28 U.S.C. § 546 grants the Attorney General authority to appoint interim U.S. Attorneys for a limited term of 120 days. Specifically, § 546(c) states that a person appointed as a U.S. Attorney under this section may serve until the earlier of either the qualification of a U.S. Attorney appointed by the President under § 541, or the expiration of 120 days after the Attorney General's appointment. If the vacancy remains unfilled beyond 120 days, the authority to appoint an interim U.S. Attorney transfers exclusively to the district court judges for the relevant district. 28 U.S.C. § 546(c)-(d); *United States v. Baldwin,* 541 F.Supp.2d 1184 (D.N.M. 2008)*; United States v. Martinez*, 565 F.Supp.2d 1270 (D.N.M. 2008). Congress has periodically amended § 546 to balance the need for continuity in the office of U.S. Attorneys with constitutional principles, such as the Appointments Clause and separation of powers.

Historically, before 1986, district courts had exclusive authority to appoint interim U.S. Attorneys when a vacancy arose. *See* H.R. Rep. No. 110-58, at 4 (2007).[1] The enactment of § 546 in 1986 revised this arrangement, limiting the Attorney General's appointment to a 120-day term, and thereafter shifting appointing authority to district courts if the vacancy remain unfilled. *Id*. Congress specifically designed this statutory framework as an incentive to both expedite Presidential nominations and ensure prompt Senate action. *Id.*; Anne Joseph O'Connell, *Interim and Acting U.S. Attorneys: Raised Issues for Congress,* Cong. Rsch. Serv. (Mar. 21, 2007), at 3-4. This procedure clearly indicates that § 546, as enacted in 1986, was intended to serve as a constitutional check on executive power through judicial oversight. *See id.*

The 2006 Patriot Act amendments (Pub. L. No. 109-177) temporarily eliminated judicial oversight and vested sole authority for interim appointments in the Attorney General, without any

---

[1] Available at https://www.govinfo.gov/content/pkg/CRPT-110hrpt58/html/CRPT-110hrpt58.htm.

clear time limitation. *See* H.R. Rep. No. 110-58, at 4-5. Congress quickly recognized the adverse effects of these amendments, including disruption to prosecutorial stability and morale, erosion of public confidence in federal law enforcement, and increased risks of political interference in sensitive investigations. *See* H.R. Rep. No. 110-58, at 5-6.[2] Congress also acknowledged that an administration might abuse this unchecked authority, repeatedly exploiting § 546 and the FVRA to circumvent the Senate's constitutional advice-and-consent role and thereby unlawfully consolidate appointment and removal powers in the Executive Branch alone. *Id*. at 6-7. Accordingly, in 2007, Congress passed the Preserving United States Attorney Independence Act of 2007 (Pub. L. No. 110-34, 121 Stat. 224), which amended § 546 by reinstating both 120-day limit on the tenure of interim U.S. Attorneys appointed by the Attorney General and the judiciary's authority to appoint U.S. Attorneys under 28 U.S.C. § 546(d).

The Executive Branch's appointment of Ms. Habba as Acting U.S. Attorney beyond the 120-day limit set by 28 U.S.C. § 546, and its perversion of the FVRA to bypass Senate confirmation, are an embodiment of the exact types of abuses and erosions of legislative oversight Congress sought to prevent through these enactments. The Executive's actions violate clear statutory constraints and threaten to nullify the Senate's constitutionally mandated advice-and-consent function.

---

[2] Notably, Professor Laurie L. Stevenson of Loyola Law School highlighted the demoralizing impact caused by situations analogous to Ms. Grace's "abrupt, unexplained removal" and replacement by Ms. Habba, noting that "[i]t is deeply demoralizing for them to now see capable leaders with proven track records of successful prosecutions summarily dismissed and replaced by those who lack the qualifications and professional backgrounds traditionally expected of United States Attorneys." *See* Prepared Statement of Prof. Laurie L. Stevenson, Hearing before S. Comm. on the Judiciary, 110th Cong, quoted in H.R. Rep. No. 110-58, at 6.

### ii. DISCUSSION

As a threshold matter, the Court must first determine whether Ms. Habba's original interim term expired on July 22, 2025, July 26, 2025, or some earlier date, as this finding impacts the subsequent analysis of whether her resignation and immediate re-appointment unlawfully circumvented the FVRA and 28 U.S.C. § 546.

**The Attorney General's Appointment Authority Under 28 U.S.C. § 546 is Limited to a Single 120-Day Term**

As mentioned, under § 546, the Attorney General may appoint an interim U.S. Attorney for a maximum period of 120 days. *See* 28 U.S.C. § 546(c). Both the legislative history and later interpretations of § 546, including by the Department of Justice ("DOJ"), suggest that Congress intended the Attorney General's authority under the statute to be limited to a *single*, 120-day appointment. *See* H.R. Rep. No. 110-58, at 6; *see also* Ross E. Wiener, *Inter-Branch Appointments After the Independent Counsel: Court Appointment of United States Attorney*, 86 Minn. L. Rev. 363, 401-03 (2001) (legislative history and DOJ guidance indicate Congress intended to restrict the Attorney General to only one 120-day appointment) (citing Memorandum from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, to William P. Tyson, Director, Executive Office for United States Attorneys 3 (Nov. 13, 1986)). After this 120-day period, the statute expressly provides for the district court to step in and make an interim appointment, precluding the Attorney General from making successive appointments. *See* 28 U.S.C. § 546.

This interpretation is further supported by decisional law. For example, in *United States v. Baldwin*, the court noted that the statutory scheme embodies Congress's clear intent to shift appointment authority to district courts once the Attorney General's 120-day period expires. 541 F.Supp.2d at 1192-93. Similarly, in *United States v. Martinez,* the court confirmed that the

Attorney General's appointment authority is capped at 120 days, after which the district court may act under § 546(d). 565 F.Supp.2d at 1272-73.

In light of the above, there are two plausible interpretations of the events surrounding Ms. Habba's appointment in this case, each of which renders her appointment invalid:

First, AG Bondi's appointment of Ms. Habba was invalid from the outset because § 546 provides the Attorney General authority for only one interim appointment, lasting no more than 120 days. This statutory limitation, confirmed explicitly in DOJ guidance, prohibits repeated or successive interim appointments beyond a single, finite 120-day term. Under this interpretation, once John Giordano occupied the interim U.S. Attorney position (however briefly), AG Bondi exhausted her statutory appointment power under § 546, rendering any subsequent interim appointment of Ms. Habba void *ab initio*.

Second, even if the subsequent appointment of Ms. Habba was valid, the approximately three weeks during which Mr. Giordano served as interim U.S. Attorney necessarily consumed part of the single 120-day statutory appointment period under § 546. This interpretation significantly shortens the total permissible duration of Ms. Habba's interim appointment, causing it to expire no later than July 1, 2025. Thus, even under this alternative interpretation, Ms. Habba's interim appointment definitively concluded before the District Court appointed Ms. Grace as Acting U.S. Attorney effective July 22, 2025, leaving no vacancy or opening for the Government to subsequently fill under the FVRA.

Under either interpretation, the Government's current position is legally untenable, as both scenarios described above render Ms. Habba's continued service as Acting U.S. Attorney invalid. The Government's disregard of clear statutory constraints and its attempt to prolong or repeatedly

renew interim appointments in this manner directly contravene both the plain language and congressional intent of § 546. Therefore, Ms. Habba's appointment is *ultra vires* and invalid.

### Ms. Habba's Appointment Took Effect on March 24, Not March 28, and Therefore Her Term Expired on July 22

If Ms. Habba was appointed interim U.S. Attorney for the District of New Jersey on March 24, 2025, with a limited term of 120 days, her term would have ended on July 22, 2025. However, the Government now asserts – contrary to President Trump's own public statements – that Ms. Habba's interim appointment began on March 28, 2025, which was the effective date of an order purportedly issued by AG Bondi dated March 27, 2025. (Docs. 108, p. 5; 108-1). The Government's position is as confusing as it is suspicious.

In its submissions, the Government relies heavily on President Trump's inherent Article II authority but selectively omits critical facts regarding the effective date of Ms. Habba's appointment. For one, the Government's current position inexplicably disregards President Trump's own public statement on March 24, 2025, announcing via Truth Social:

> *"It is with great pleasure that I am announcing Alina Habba, Esq., who is currently serving as Counselor to the President, and has represented me for a long time, will be our interim U.S. Attorney for the District of New Jersey, her Home State, **effective immediately!**"*

(emphasis added).

If President Trump's proclamation was indeed "effective immediately!" as of March 24th, then under controlling statute, Ms. Habba's appointment expired 120 days later, on **July 22, 2025**.

Notably, the District Court's Standing Order appointing Ms. Grace as interim U.S. Attorney expressly identified July 22, 2025 – the 120th day from the March 24th appointment – as the earliest effective date. The District Court's decision to reference July 22nd strongly indicates its awareness of the President's announcement and its potential legal significance. Additionally,

contemporaneous public statements by AG Bondi and Deputy Attorney General Todd Blanche on July 22, 2025, are likewise notable.  On that day, both AG Bondi and DAG Blanche publicly condemned the District Court's Standing Order appointing Ms. Grace and announced on social media that Ms. Grace had been "removed" effective immediately.  Indeed, at some point on July 22nd, the director of the Executive Office for United States Attorneys ("EOUSA") sent a memorandum to Ms. Grace informing her that she had been fired. (Doc. 118-3).  This prompt reaction strongly suggests recognition by the Executive Branch that July 22nd – not July 26th – marked the true end of Ms. Habba's statutory appointment as interim U.S. Attorney.  Thus, the Government's recent claim that March 28th, rather than March 24th, marks the effective date of Ms. Habba's interim appointment appears to be nothing more than a *post hoc* rationalization designed solely to evade the clear legal implications of Ms. Grace's judicial appointment.

To be sure, the Government has failed entirely to address the operative effect of President Trump's March 24th statement, despite its sweeping claims regarding the President's Article II authority.  The Government's filings assert broadly that "[t]he President has made clear that he will not permit anyone other than Ms. Habba to fill the current vacancy in the office of the United States Attorney on a temporary basis," (Doc. 108, pp. 21-22), yet paradoxically will likely argue that the Attorney General possessed the exclusive authority to initiate the appointment under § 546.  The Government cannot credibly maintain both positions simultaneously: either the President's expansive Article II authority allowed him to validly appoint Ms. Habba effective March 24th, or his authority is constrained, and Ms. Habba's appointment is valid only from March 28th.  The Government's failure to address or reconcile this contradiction highlights the arbitrary and inconsistent nature of its position and warrants further scrutiny.

**Only the District Court May Fill a Vacancy After Expiration of the AG's 120-Day Term**

Even assuming, *arguendo*, that Ms. Habba was validly serving past July 22, 2025, in any event, once her interim term expires, only the district court can appoint a temporary replacement, not the Attorney General or the President. *See* 28 U.S.C. § 546(d).  Thus, for Ms. Habba's tenure to lawfully continue beyond the 120-day limit, she either needed to be confirmed by the Senate or approved in a vote of New Jersey's District Court judges.  Neither occurred.  Instead, consistent with its exclusive statutory authority, the District Court lawfully appointed career prosecutor Ms. Grace as interim U.S. Attorney pursuant to 28 U.S.C. § 546(d).

Furthermore, once Ms. Grace assumed the role of Acting U.S. Attorney by operation of the Standing Order, arguably only President Trump had the authority to remove her. *See* U.S. Dept. of Justice, Office of Legal Counsel, *U.S. Attorneys—Removal of Court-Appointed U.S. Attorneys (28 U.S.C. §§ 541,546)* (Nov. 26, 1979) (Memorandum Opinion for the Acting Director, EOUSA), reprinted in 3 Op. O.L.C. 79 (1979); *United States v. Hilario*, 218 F.3d 19, 24, 27 (1st Cir. 2000). *Cf. Ex Parte Duncan H. Hennen*, 38 U.S. 230, 259-60 (1839) (power to remove is incident of the power to appoint); *Nat. Treas. Emp. Union v. Reagan*, 663 F.2d 239, 247 (D.C. Cir. 1981) (power to remove is held exclusively by the appointing authority).  Consequently, the DOJ's purported removal of Ms. Grace was ineffective, and Ms. Grace remains the lawful Acting U.S. Attorney. The Executive's refusal to recognize the court's appointment not only violated § 546(d), but it also intruded upon the judiciary's independent constitutional role in the appointments process.

**The Executive's "Workaround" Renders § 524 a Nullity and is a
Violation of Both the Appointments Clause and Separation of Powers Doctrine**

Congress, exercising its exclusive prerogative under the Appointments Clause's "Excepting Clause," deliberately vested post-120-day interim appointment authority for U.S. Attorneys in the *district courts* rather than the Executive. 28 U.S.C. § 546(c)-(d).  This enactment

was specifically designed as a safeguard to ensure that, after an Attorney General's limited 120-day term, the Executive could not perpetually control a PAS office without Senate confirmation. *See* H.R. Rep. No. 110-58, at 6; *Baldwin*, 541 F. Supp. 2d at 1192-93.

By orchestrating Ms. Habba's resignation and immediate re-appointment—while a district court appointment was pending or in effect—the Executive circumvented § 546(d). This maneuver effectively nullified the statutory transfer of authority to the judiciary. The Government now disingenuously argues that the "condition precedent" for judicial appointment under § 546(d) was never triggered because Ms. Habba resigned before the 120-day term expired. (Doc. 108, p. 9). Such a "workaround" would lead to absurd consequences and render § 546(d) meaningless. Indeed, it would allow *any* Attorney General-appointed interim U.S. Attorney to resign on day 119 and be reinstalled under the FVRA for another 210 days, or perhaps indefinitely under some other authority (which is the result the Government seeks here), thereby avoiding the statutory handoff to the judiciary and defeating the separation-of-powers safeguard that Congress enacted. No reasonable interpretation of § 546(d) or the Appointments Clause would support such a result.

If allowed to stand, this workaround would enable the Attorney General and President to cycle appointees indefinitely, bypassing both the Senate's advice-and-consent role and the statutorily mandated judicial check that Congress imposed. This would undermine the separation of powers by consolidating appointment and removal authority solely within the Executive Branch, which is inconsistent with basic constitutional principles and lead to a result that Congress sought to avoid when amending § 546 in 2007.

The Supreme Court has repeatedly affirmed that the Appointments Clause is a core structural safeguard protecting the separation of powers, and not a mere procedural formality. *See Weiss*, 510 U.S. at 187 (Souter, J., concurring); *SW General*, 580 U.S. at 295-96. Here, Congress

exercised its authority "by law" to assign interim appointment power, after the 120-day period, to the "Courts of Law." *See* U.S. Const. art. II, § 2, cl. 2.  The Executive's attempted circumvention of this statutory scheme directly infringes Congress's constitutional prerogative and upsets the careful balance between the branches of government.

In sum, the Executive's workaround nullifies § 546(d)'s judicial appointment provision, while contravening both the Appointments Clause and separation-of-powers principles, and consolidating appointment authority solely within the Executive Branch.  It must be rejected.

### Ms. Habba's Re-Appointment Violates the FVRA

Despite Ms. Grace's valid judicial appointment, AG Bondi unlawfully removed her and reinstalled Ms. Habba, who the Administration knew was statutorily disqualified from continuing to serve as acting U.S. Attorney under the FVRA (*see* 5 U.S.C. § 3345(b)(1)).  Thus, the Government's contention that Ms. Habba created a new vacancy by resigning on July 24th, thereby enabling her re-appointment under the FVRA after being designated as "First Assistant," is without merit.  This theory is inconsistent with the FVRA's text, structure and controlling precedent.

First, the authority to fill vacancies by way of the FVRA is triggered only upon the existence of an actual vacancy. *See* 5 U.S.C. § 3345(a) (provisions of FVRA apply when PAS officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office"); *SW General,* 580 U.S. at 318.  Here, there was no vacancy to fill.  The District Court's Standing Order explicitly appointed Ms. Grace as interim U.S. Attorney effective July 22, 2025, or upon expiration of the statutory 120-day period, whichever occurred later.  By its express terms, the Standing Order was intended to seamlessly fill the opening created upon the expiration of Ms. Habba's interim term.  Thus, assuming Ms. Habba's resignation on July 24th had any legally operative effect, once she resigned, the District Court's appointment of Ms. Grace immediately

took effect, leaving no vacancy to trigger a new appointment under the FVRA.[3]  Terminating Ms. Grace's employment as a civil service official did not – and legally could not – terminate the District Court's judicial appointment. See 28 U.S.C. § 546(d).   Nor could the President's belated attempt to remove Ms. Grace on July 26th retroactively establish a vacancy for Ms. Habba to fill. Therefore, the FVRA does not apply and otherwise does not permit manipulation of subordinate positions to predetermine who will ascend upon a vacancy.

Second, Section 3345(a)(1) is triggered "[i]f an officer … dies, resigns, or **is** otherwise **unable** to perform the functions and duties of the office," at which point "**the** first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity" (emphasis added).  The use of the definite article "the" and the present-tense construction ("is … unable") makes clear that the "first assistant" is the person holding that position when the vacancy occurs, not someone installed afterward to backfill the role.

The Supreme Court in *SW General, Inc.* characterized § 3345(a)(1) as the FVRA's "default rule" under which "the first assistant automatically becomes the acting officer when the office becomes vacant." 580 U.S. 288, 318 (2017).  Other courts have likewise held that the provision applies only to the individual serving as first assistant at the time of the vacancy. *See Cuccinelli*, 442 F. Supp. 3d at 27–28 (rejecting post-vacancy designation designed to install a preferred candidate); *English v. Trump*, 279 F. Supp. 3d 307, 322–23 (D.D.C. 2018) (describing § 3345(a)(1) as an "automatic" elevation for the existing first assistant); *Hooks ex rel. NLRB v. Kitsap Tenant Support Servs.*, 816 F.3d 550, 556 (9th Cir. 2016) (default "operates without presidential action"

---

[3] The triggering "vacancy" under the FVRA arises only upon the cessation of service by the last Senate-confirmed officeholder; thus, the FVRA's clock for acting appointments begins from that date—not from a later purported vacancy generated by resignation or termination of an interim appointee. *See* O'Connell, *Interim and Acting U.S. Attorneys*, at 4.

for the person already in place); *Guedes v. BATFE*, 920 F.3d 1, 15–16 (D.C. Cir. 2019) (FVRA default "kicks in" at the moment of vacancy).

The Government's reading—allowing an agency head to designate any person as "first assistant" after a vacancy arises—collapses the FVRA's carefully separated pathways and effectively creates a fourth, limitless method of appointment.  It permits an end-run around the eligibility criteria in § 3345(a)(2)–(3), which require either PAS status or one-year prior service at the GS-15 level, and nullifies Congress's deliberate statutory structure.

Third, even if the Government could rely on the FVRA to achieve its desired end, Ms. Habba remained ineligible for appointment as Acting U.S. Attorney under 5 U.S.C. § 3345(b)(1). That provision of the FVRA bars the appointment of any person to a PAS office in an acting capacity if they have been nominated for the permanent position and have not served for at least 90 days as first assistant in the year preceding the vacancy. *See* 5 U.S.C. § 3345(b)(1); *SW General,* 580 U.S. at 295-96.  The purpose, as both Congress and the Supreme Court have recognized, is to prevent the FVRA from being used to place nominees prematurely into positions requiring Senate confirmation. *See SW General*, 580 U.S. at 295-96 (internal citations omitted).  Because Ms. Habba indisputably failed to serve as first assistant for the statutorily required 90-day period and had already been nominated for the permanent post, she is categorically disqualified from serving in an "acting" capacity under the FVRA. *See* § 3345(b)(1); *SW General,* 580 U.S. at 295-96.  Thus, even setting aside the fundamental statutory incompatibility of permitting an FVRA appointment following the expiration of a specific interim appointment under § 546 (discussed, *infra*), Ms. Habba is precluded from serving pursuant to the FVRA in any event.

Nevertheless, the Government contends that the statutory bar under § 3345(b)(1) applies only where the nominee's name is pending before the Senate *at the moment of appointment*. (Doc.

108, p. 12).   Thus, because the President withdrew Ms. Habba's nomination prior to her designation as First Assistant and before she assumed the acting position, the Government claims that the withdrawal of her nomination entirely removes the statutory impediment under § 3345(b)(1).   The Government's strained reading of the statute is both textually and purposively wrong.[4]

The Government's narrow interpretation of § 3345(b)(1)(B) is fundamentally inconsistent with the broader statutory purpose. *See generally* S. Rep. No. 105-250 (1998)[5]; *see also Freytag v. Commissioner,* 501 U.S. 868, 883 (1991) ("The manipulation of official appointments had long been one of the American revolutionary generation's greatest grievances against executive power because the power of appointment to offices was deemed the most insidious and powerful weapon of eighteenth century despotism.") (internal citations and quotation marks omitted).   Congress sought to ensure that the FVRA would not be exploited to install a nominee who has either been rejected by or has not yet received Senate approval, as doing so would circumvent the Senate's constitutionally mandated advice-and-consent role. *Id.*

The language of an unambiguous statute typically determines its meaning. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997); *Freytag,* 501 U.S. at 873; *Dickerson v. New Banner Inst., Inc.,* 460 U.S. 103, 110 (1983).   That is, "if the plain language of the statute points unerringly in a single direction, an inquiring court ordinarily should look no further." *Lopez-Soto v. Hawayek*, 175 F.3d 170, 172 (1st Cir. 1999); *see Shell Oil Co.,* 519 U.S. at 341 ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole.") (internal citations

---

[4] The Government has no choice but to make this argument.   After all, the conveniently timed withdrawal of Ms. Habba's nomination on the very same day as her resignation as interim U.S. Attorney is a tacit admission that the pending nomination posed at least one obstacle to her FVRA appointment.

[5] Available at https://www.congress.gov/committee-report/105th-congress/senate-report/250/1

omitted); *see also Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text") (internal citation omitted).

While the FVRA does not define "submits," the plain language of § 3345(b)(1) indicates that the prohibition attaches immediately upon submission of a nominee's name to the Senate, and the statute otherwise contains no safe harbor for later withdrawal. As such, disqualification applies immediately once the President "submits" a nomination, regardless of subsequent withdrawal. Therefore, even if the FVRA could theoretically apply after a § 546(d) appointment (it cannot), Ms. Habba is statutorily barred from serving under § 3345(b)(1).

Finally, and perhaps most significantly, the Government's factual narrative is clouded by, among other things, unresolved questions regarding the precise timing of Ms. Habba's resignation, the withdrawal of her nomination and her immediate re-designation as first assistant. This ambiguity is material, because if the withdrawal occurred after either the resignation or the re-designation, the statutory bar under § 3345(b)(1) would plainly apply. The Government has offered no contemporaneous documentation to clarify this timeline, and in such circumstances, the Court should not accept its self-serving characterization of events.

### Ms. Habba's Re-Appointment Under the FVRA is Unconstitutional

The Government's effort to justify Ms. Habba's continued service as Acting United States Attorney after the expiration of her § 546(c) interim term not only contravenes the plain text of the FVRA but also violates the Appointments Clause and fundamental separation-of-powers principles.

In *SW General*, the Supreme Court emphasized that Congress enacted the FVRA to address "a threat to the Senate's advice and consent power" and to ensure that acting service remains temporary, not a mechanism for indefinite executive control. 580 U.S. at 295. The withdrawal-

resignation-reappointment device employed here is a naked attempt to manipulate the FVRA and appoint someone the Senate would likely not confirm.

By engineering Ms. Habba's resignation just before the § 546(d) judicial appointment took effect, designating her as "First Assistant" after the fact and then invoking § 3345(a)(1) to reinstate her as Acting U.S. Attorney, the Executive has nullified statutory succession rules and effectively installed its preferred choice without Senate confirmation.  This type of Executive malfeasance erodes the Senate's constitutionally assigned role in the appointments process and defeats Congress's deliberate choice, reflected in § 546(d), to transfer appointment power to the courts once the Attorney General's limited term expires.  No reading of the FVRA can legitimize this circumvention without rendering its eligibility and timing restrictions meaningless.

### The Invalid Appointment Violates Due Process By Undermining the Legitimacy and Impartiality of the Prosecution

The Due Process Clause safeguards not merely the outcome of a criminal proceeding, but the *integrity of the process itself*.  When the Government conducts a prosecution under the authority of an unlawfully appointed officer, the structural defect permeates every stage of the case, creating a presumption of unfairness that cannot be cured by post-hoc ratification. See *Tumey v. Ohio*, 273 U.S. 510, 523 (1927) (due process is violated where the structure of the proceeding presents a possible temptation to the average official to forget the burden of proof or not hold the balance fair and true); *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972) (due process requires "a neutral and detached" decisionmaker, and the absence of such structural neutrality is itself a constitutional injury).

In this case, the Executive's calculated override of a lawful judicial appointment under 28 U.S.C. § 546(d) and its installation of a statutorily ineligible nominee under 5 U.S.C. § 3345(b)(1) not only breached the separation of powers, but also stripped the prosecution of its structural

20

neutrality.  The head of the prosecution team—the Acting United States Attorney—is not lawfully in office.  That illegitimacy affects all subordinate prosecutorial acts because the AUSAs operate under her delegated authority, invoke her name in pleadings, and follow her policy directives.  The legitimacy of prosecutorial decision-making is therefore inseparable from the lawfulness of her appointment.

To be sure, the United States Attorney is not a ceremonial officer.  As codified in 28 U.S.C. § 547 and articulated in the U.S. Attorney's Manual (USAM 3-1.130), "each United States Attorney, within his/her district, has the responsibility and authority to: (a) prosecute for all offenses against the United States; (b) prosecute or defend, for the government, all civil actions, suits, or proceedings in which the United States is concerned; … (d) institute and prosecute proceedings for the collection of fines, penalties, and forfeitures incurred for violation of any revenue law …; and (e) make such reports as the Attorney General shall direct."  This statutory mandate is coupled with "plenary authority with regard to federal criminal matters," exercised under the supervision of the Attorney General.

The U.S. Attorney's role carries "the broadest discretion in the exercise of such authority" (USAM 3-1.130), and the scope of this power in criminal matters is expansive. As set forth in USAM 9-2.001, it includes, without limitation: (1) investigating suspected offenses; (2) directing investigative agencies; (3) declining or authorizing prosecution; (4) determining the manner of prosecution and trial-related questions; (5) recommending appeals; (6) dismissing prosecutions; and (7) handling related civil matters. These powers—investigative, charging, trial, and appellate—are among the most consequential in the federal justice system.

This is not a situation where due process concerns are speculative or remote. The ongoing prosecution involves active, case-specific supervisory decisions by Ms. Habba—charging

determinations, plea negotiations, evidentiary strategies, and trial preparation—all of which depend on the lawful exercise of prosecutorial discretion.  As the Supreme Court recognized in *Young v. United States ex rel. Vuitton Et Fils S.A.*, 481 U.S. 787, 810 (1987), a prosecutor's structural independence and lawfulness of appointment are fundamental to ensuring impartiality and public confidence in the criminal process. A defendant is entitled not merely to a fair trial before an impartial judge, but also to a fair prosecution by a constitutionally authorized prosecutor.

Finally, the public integrity dimension cannot be ignored.  Allowing this prosecution to proceed under an invalidly appointed United States Attorney signals that constitutional and statutory appointment rules are optional.  That perception erodes confidence in the DOJ's adherence to the rule of law and undermines the appearance of justice, which the Supreme Court has recognized is itself a due process concern. *See Peters v. Kiff*, 407 U.S. 493, 502–03 (1972).

Accordingly, because the duties and powers of the U.S. Attorney are so central and plenary in federal criminal prosecutions, the continued exercise of those powers by an unlawfully appointed officer violates due process. At a minimum, due process requires immediate disqualification of Ms. Habba and any AUSAs acting under her supervision so that prosecutorial decisions are made within a constitutionally valid framework.

## II.   THE ATTORNEY GENERAL DOES NOT HAVE AUTHORITY TO DELEGATE THE POWERS OF A UNITED STATES ATTORNEY THROUGH A "SPECIAL ATTORNEY" OR "FIRST ASSISTANT" DESIGNATION UNDER 28 U.S.C. § 515

The Government's attempts to legitimize Ms. Habba's indefinite appointment as "special attorney" to the Attorney General, purportedly vesting her with all powers and duties of a U.S. Attorney, are not merely unprecedented (and extreme) but fundamentally inconsistent with constitutional and statutory limitations.

The Supreme Court has unequivocally recognized that holding the full authority of an office indefinitely is functionally indistinguishable from occupying the office itself, irrespective of the formal title given. *See SW General*, 580 U.S. at 295.  Allowing indefinite service under the guise of a different title or alternative designation impermissibly evades these statutory limits and undermines the Senate's constitutional power of advice and consent. *See id.* at 295-96.

Furthermore, the Attorney General's July 24, 2025 order appointing Ms. Habba as a "special attorney" and simultaneously designating her as first assistant, purportedly with the authority to serve as Acting U.S. Attorney under the FVRA, creates a substantial and irreconcilable ambiguity as to the actual legal authority under which she is operating.  The FVRA and any alternative designation under 28 U.S.C. § 515 cannot be used interchangeably or simultaneously to avoid clear statutory restrictions.  Indeed, the FVRA includes stringent enforcement provisions precisely to prevent Executive maneuvers designed to evade Senate confirmation and statutory time limits. *See SW General*, 580 U.S. at 296-97.

Here, the Government does not merely assert alternative statutory authorities – it seeks to deploy them consecutively.  Such use of the FVRA and alternative statutory provisions in tandem exacerbates existing statutory conflicts.   Notably, the FVRA's 210-day limit is directly incompatible with the 120-day limit provided by 28 U.S.C. § 546(d), after which the District Court is empowered to appoint an interim U.S. Attorney.  Congress plainly did not contemplate – and the statutes cannot reasonably be read to allow – a cumulative 330-day appointment period achieved by combining the provisions of § 546(d) and the FVRA.  The Government's proposed approach contravenes both the express language and the clear statutory intent of Congress, creating serious constitutional concerns by authorizing executive appointments to exceed congressionally prescribed limits.

Additionally, the Government's attempt to distinguish this case from *SW General* is fundamentally at odds with the Supreme Court's clear holding and explicit reasoning. In *SW General*, the Supreme Court specifically held that "[Section 3345(b)(1)] prohibits anyone who has been nominated to fill a vacant PAS office from performing the duties of that office in an acting capacity," regardless of the mechanism by which they were initially appointed under the FVRA. *Id.* at 304. The Supreme Court explicitly rejected narrow interpretations limiting the scope of this prohibition solely to first assistants or to the formal "acting" designation, emphasizing instead the practical and functional reality: once nominated for a PAS office, an individual is prohibited from performing the office's functions and duties under the FVRA, irrespective of their formal title or purported mechanism of delegation. *Id.*

The Government's assertion that the Supreme Court "did not state—much less hold—that the individual cannot perform those duties in a different capacity" invents a distinction that the Supreme Court explicitly foreclosed. By adopting a functional approach, the Court made clear that it would not permit circumvention of FVRA restrictions by merely changing an official's title or labeling their appointment differently. Allowing nominees to perform identical duties through delegation rather than through formal acting designations would directly undermine the FVRA's core purpose: preserving the Senate's constitutional prerogative by ensuring nominees do not prematurely exercise office authority without Senate confirmation.

Moreover, the Government's interpretation of § 3348's provisions regarding delegable and non-delegable duties further distorts statutory meaning. Although § 3348 establishes specific enforcement mechanisms, it in no way authorizes nominees barred under § 3345(b)(1) to indirectly assume office duties through delegation. Interpreting the statute otherwise would render the FVRA meaningless, providing an easily exploitable path to avoid Senate confirmation—precisely what

24

Congress sought to prevent. The Supreme Court in *SW General* explicitly rejected such a strained and narrow reading of the FVRA.

In short, the Government's interpretation improperly narrows and fundamentally undermines the purpose and scope of the Supreme Court's clear holding. This Court should reject the Government's flawed interpretation and faithfully enforce the Supreme Court's comprehensive ruling, thereby preserving the separation of powers established by Congress and unequivocally reaffirmed in *SW General*. Ms. Habba's indefinite appointment as a "special attorney" or "first assistant" U.S. Attorney is plainly invalid, constituting an impermissible end-run around explicit statutory and constitutional constraints.

## CONCLUSION

For the foregoing reasons, Defendant Julien Giraud Jr. respectfully requests that the Court issue injunctive relief enjoining Ms. Habba, or any Assistant United States Attorney acting under her authority, from further prosecutorial action.

Respectfully submitted,

LAW OFFICE OF
THOMAS S. MIRIGLIANO, ESQ., P.C.

Dated: New York, New York          By: _____
        August 7, 2025                        Thomas S. Mirigliano, Esq.